IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 10, 2023

**STATE OF TENNESSEE v. ANTHONY DUANE GRAY, JR.**

**Appeal from the Circuit Court for Montgomery County
Nos. CC-18-CR-1359       William R. Goodman, III, Judge**

——————————————————

**No. M2022-01233-CCA-R3-CD**

——————————————————

A Montgomery County jury convicted the Defendant, Anthony Duane Gray, Jr., of assault, kidnapping, possession with intent to sell or deliver heroin, four counts of possession with the intent to sell or deliver four different scheduled drugs, and possession of drug paraphernalia. The trial court sentenced him as a Multiple Offender to an effective sentence of fourteen years of incarceration. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to sever his offenses; (2) the trial court erred when it denied his motion to suppress evidence found during the search of a motel room; (3) the trial court erred with it denied his motion to suppress evidence obtained from the search of two cell phones; (4) the State violated his right to due process by intentionally allowing false testimony; (5) the trial court erred when it denied his motion for a judgment of acquittal to the charge of especially aggravated kidnapping; (6) the evidence was insufficient to sustain his conviction for kidnapping; and (7) the trial court erred when it denied his motion for new trial. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Terria D. Blunt, Kenneth W. Merriweather, and Travis N. Meeks, Clarksville, Tennessee, for the appellant, Anthony Duane Gray, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and C. Daniel Brollier, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from police officers responding to a motel room on June 25, 2018, about a possible domestic assault. Present in the motel room were the Defendant and another man, Chris Ingraham. The Defendant attempted to leave, but was detained, and Mr. Ingraham allowed the officers into the room, where they found large quantities of heroin, smaller quantities of other scheduled drugs, and items that appeared to be associated with reselling the drugs. As a result, a Montgomery County grand jury indicted the Defendant on several counts. Some of those charges were dismissed by the State, others were bifurcated for trial[1], and the charges as relevant to this appeal were as follows: Count 1, aggravated assault by use or display of a weapon; Count 2, especially aggravated kidnapping; Count 3, resisting arrest; Count 4, possession with intent to manufacture, sell or deliver heroin; Count 5, possession with intent to manufacture, sell or deliver marijuana; Count 6, possession with intent to manufacture, sell or deliver Schedule IV Diazepam (Valium); Count 7, possession with intent to sell or deliver Clonazepam; Count 8, possession with intent to sell or deliver Schedule IV drug Alprazolam (Xanax); Count 9, possession of drug paraphernalia; Count 10, possession of a firearm with intent to go armed during a dangerous felony; and Count 11, possession with intent to sell or deliver a Schedule IV controlled substance, Cathine.

## A. Pretrial Motions

The Defendant filed a motion to sever the offenses, a motion to suppress evidence found on two cell phones, and a motion to suppress evidence found in the motel room. In his motion to suppress the evidence from the cell phones, the Defendant stated that the officer who filed the application for the search warrant, Deputy Emmanuel Graham, made "willful reckless misrepresentations" in the application.

## 1. November 5, 2019 Hearing

On November 5, 2019, the trial court held a hearing on the Defendant's motions.[2] The State informed the trial court that it had not responded to the Defendant's motion to suppress because it conceded that Deputy Graham made an incorrect statement of fact when he applied for the cell phone search. The Assistant District Attorney ("ADA") stated that, upon learning of the misstatements, he contacted law enforcement officers to obtain a new search warrant with the correct facts in the affidavit. That search warrant had been executed on the cell phones, a second search conducted, and the ADA said he would get the findings to the Defendant's attorney as soon as they were available.

The Defendant proceeded on his other motions, including his motion to suppress evidence law enforcement officers found in the motel room. He posited that the officers

---

[1]Ultimately, the State dismissed the charge that was bifurcated, and it is not relevant to this appeal.
[2] The transcript of this hearing is included in the record as an exhibit, Exhibit #7.

did not have consent to search the motel room. The State then offered the motel registration, and the hearing proceeded.

Multiple officers testified about their response to this domestic disturbance call. Joshua Clegg, with the Montgomery County Sheriff's Department, responded first to the call in this case and parked to the side of the motel. He activated his audio recording equipment and walked towards the motel room. He stood outside and listened before contacting anyone. Upon hearing nothing, Officer Clegg knocked on the door, and Mr. Ingraham answered the door. Officer Clegg informed him that he was there responding to a 911 call about a domestic altercation. Mr. Ingraham stepped outside of the room, leaving the door open, and said that everything was fine and had calmed down, explaining that the argument was between the Defendant and the Defendant's girlfriend, who had since left the premises.

While Officer Clegg was speaking to Mr. Ingraham, the Defendant exited the motel room and got into a vehicle parked in front of the room. Officer Clegg saw that the vehicle started, so he asked the other officers who were responding to the scene, Officer Alexander Koziol and Officer David Mann, to detain the Defendant. Officer Koziol noticed the reverse lights come on as he approached the vehicle parked in front of the motel room, and based on information Officer Clegg relayed, he asked the Defendant, who was in the driver's seat, to turn off the engine and provide some identification. The Defendant identified himself as "Jordan" and said that he did not have any identification. Officer Mann assisted Officer Koziol and then, based on information from Mr. Ingraham, went to look for the victim at a nearby motel.

While Officer Mann was departing, Officer Koziol asked the Defendant to exit the vehicle, and, when the Defendant complied, his driver's license that listed his name as Anthony Gray, fell to the ground. Officer Koziol noticed something in the Defendant's pocket, and the Defendant told him that it was a "blunt," which the officer understood to mean a marijuana cigar. The officer searched him, found a pill bottle in his pocket that contained the marijuana cigar, and detained him for criminal impersonation and simple possession and because he had outstanding warrants. Officer Knoblock arrived at the scene as the other officers were asking the Defendant to exit his vehicle. He saw a small struggle between Officer Koziol and the Defendant, so he went toward Officer Koziol and assisted him. Officer Knoblock said that he collected a key card to the motel room from the Defendant, so he believed that the Defendant had been in the motel room. The Defendant, however, at some point, said to the officers that he was just at the motel room "visiting a friend."

Officer Knoblock smelled an odor of marijuana coming from the motel room, and he said Mr. Ingraham was being detained because of that fact. Officer Knoblock also acknowledged that he is heard on the recording from police equipment saying he could not smell marijuana but smelled cigarettes. Later, Officer Mann returned and took Mr.

3

Ingraham, who possessed a weapon, into custody. Officer Koziol assisted and took the gun out of Mr. Ingraham's waistline of his pants and placed it on the hood of the vehicle. Officer Knoblock heard Mr. Ingraham say that he took the gun out of the motel room so that the Defendant would not get into more trouble. The officers were discussing among themselves whether to enter the room, and Mr. Ingraham said, "Well, I left the door open for you all." At that point, Officer Koziol and Officer Knoblock entered the room to clear it for officer safety and to ensure there was no one else armed and present in the room. The bathroom of the motel room was locked, so the officers knocked, announced, and then kicked the door open. The found no one present in the bathroom or the motel room.

Officer Koziol saw in plain view an open drawer containing blue and yellow pills. Officer Koziol said that, while he requested the dash camera footage from the incident, he was unable to obtain it. Officer Knoblock also went into the room and saw signs of possible narcotics use and also possible narcotics, including empty capsule pills.

The State entered a DVD of a recording from one of the officer's recording equipment. On it, Mr. Ingraham is heard making a statement about how he left the door open for the officers.

After leaving the motel and before returning and arresting Mr. Ingraham, Officer Mann located the Defendant's girlfriend, Shelby Hale. Ms. Hale had bruising around her neck and what appeared to be bite marks on her thighs, all of which she showed to the officer. Officer Mann believed that Ms. Hale was under the influence when she was speaking to him. He said that she never mentioned a gun being involved in the incident but, once the gun was located, did state that the gun belonged to the Defendant. Officer Mann brought Ms. Hale back to the Super 8 Motel to speak with Officer Knoblock, who was the primary officer investigating.

Officer Mann said that it was after he brought Ms. Hale to the Super 8 Motel that Mr. Ingraham made the statement about going back into the motel room to retrieve the gun so the Defendant would not get into more trouble. Officer Mann confirmed that Mr. Ingraham said that he left the room open for the officers, "wide open for [them], if you all need it." Officer Mann identified his recording of the interaction with Mr. Ingraham during which Mr. Ingraham made these statements.

The Defendant offered the testimony of Mr. Roy Henries, who described the Defendant as "[a] good friend." Mr. Henries said that the Defendant called him the day of these events and asked him to purchase a motel room at the Super 8 Motel for the Defendant. Mr. Henries went to the motel, purchased the room which was under his name, and the Defendant reimbursed him for the expense. Mr. Henries said he gave the Defendant the key cards for the room.

4

During cross-examination, Mr. Henries said that he rented the room on June 23, for three or four days. He said that he informed the motel clerk that his "Niece Kelsey[3]" was in the room. Mr. Henries said that, while a long time had passed, he still believed that his niece was present. Mr. Henries agreed that he told police that he rented the room for a man named Chris (presumably Chris Ingraham).

Christopher Ingraham testified and said that he met the Defendant through a mutual friend. He went to the Super 8 Motel on the day of the Defendant's arrest and knocked on the door of the Defendant's room. The Defendant answered and, shortly thereafter, Ms. Hale exited the motel room. After about five minutes, law enforcement officers knocked on the door, and Mr. Ingraham answered the door at the Defendant's direction. He said that he returned to the room during the investigation, but never with a key card because he did not have one. He said that officers asked him if he was staying in the room, and he told them "no" and said that he did not have a key to the room. Mr. Ingraham said he never gave officers consent to search the motel room, and he further posited that he did not have the authority to grant a search request.

During cross-examination, Mr. Ingraham agreed that he did not tell officers in his written or recorded statement that it was not his motel room. He maintained, however, that he told Officer Clegg when he first arrived that the motel room did not belong to him. He agreed that he went back into the motel room three or four times after first encountering law enforcement, and said that he picked up a key card the second time he returned to the room. Mr. Ingraham agreed that he said to law enforcement officers at the scene that he had left the door wide open for them.

Emmanuel Graham with the Montgomery County Sheriff's Department testified that he worked for the Clarksville Police Department ("CPD") at the time of this incident. He interviewed Mr. Ingraham as part of this investigation, and the defense offered a recording of that interview to refresh the officers recollection. Officers at the scene informed Deputy Graham that Mr. Ingraham had a key card to the motel room, so during the interview, Deputy Graham asked Mr. Ingraham if he had a key to the motel room. Mr. Ingraham informed the officer that the door to the motel room was already opened. Deputy clarified that he did not recall anyone saying that they observed Mr. Ingraham use the key card to enter the motel room.

Mr. Ingraham also informed Deputy Graham that Ms. Hale and the Defendant were staying in the motel room but that someone else rented the room. Mr. Ingraham also said that the Defendant fell asleep in the room and that there were other people staying there. He did not offer the name of the individual who rented the room.

---

[3]In later testimony we learn that a woman by the name "Kelsey Vance" spent at least one night, maybe two, in the motel room with the Defendant and Mr. Ingraham.

Deputy Graham also interviewed Ms. Hale who told him that the Defendant picked her up and brought her to the Super 8 Motel room.

The Defendant then stipulated that he and Ms. Hale went to the room and had sex. They were in the room together from 2:30 p.m. until approximately 6:00 p.m.

Based upon the motions, the evidence, and the arguments of counsel, the trial court denied the Defendant's the motion to suppress the evidence found after a search of the motel room. It noted that the room had been rented by Mr. Henries, who informed the motel staff that his niece Kelsey would be staying in the room. The parties presented no evidence about Kelsey or whether she was present in the room. The trial court found that the motel room was "a stopping off point for a lot of people," which was significant to determining who had "standing to give consent and who honestly has a reasonable expectation of privacy."

The trial court noted that the Super 8 Motel receipts indicated that the motel room in question was paid for in cash on June 23 for one night, then in cash again for the night of June 24, and then with cash again for the night of June 25, the day this incident occurred. He noted that there were multiple people "in and out" of this room. Ms. Hale testified at the preliminary hearing that she and the Defendant were in the room on June 25 and that they fought the whole time. The Defendant said that they had sexual intercourse.

As to the search by police that the State indicated was based upon Mr. Ingraham's consent, the trial court found that officers responded to a domestic dispute call, and knocked on the motel room door. Mr. Ingraham answered the door and told the officers that the Defendant, who was present in the room, had been fighting with the Defendant's girlfriend but that the fight had ended. The Defendant exited the motel room and went to a vehicle parked nearby. Law enforcement officers stopped and spoke with the Defendant and then detained him based upon their finding of a pill bottle on his person.

The court noted that Mr. Ingraham made multiple trips into and out of the motel room. After one of these trips, law enforcement officers stopped him and found a gun in his waistband. He told them that he got the gun from the motel room to keep the Defendant from getting into trouble. He also had a key card to the room in his possession. The trial court found that the key card gave Mr. Ingraham authority over the room. Mr. Ingraham at this point informed law enforcement officers that he left the room open for them.

The trial court found:

that [Mr. Ingraham's] statement, "I left it open for you all," is indicative that he believed that he did have authority over the room and that he had the authority to grant consent, in that, "I leave it open for you all."

6

On that basis, the Court finds that there was consent given. That the individual giving the consent had a room key, that in this instance, gives him the apparent authority, and that he believed he did have the authority.

The trial court denied the Defendant's motion to suppress the evidence found in the motel room as a result of this search.

The parties then argued whether, based on the facts, it was mandatory to join the domestic assault offenses with the drug offenses that all stemmed from this same incident. The trial court denied the Defendant's motion to sever, finding:

In this case . . . it starts out basically as a response by law-enforcement to a complaint of a domestic assault. Ms. Ha[le] it appears would be one that connects the handgun to the Defendant. She was present in the motel room.

It is in that room that drugs were located, as well as the drug paraphernalia, and it also connects that handgun as to Count Thirteen, that is, the possession of a firearm with the intent to commit the dangerous felony, the possession of a controlled substance with the intent to sell or deliver. I'm going to deny the motion to sever.

### 3. July 29, 2020 Hearing

On July 23, 2020, the State filed a motion to consolidate offenses from cases CC-2018-CR-1359 and CC-2020-CR-691. Case CC-2020-CR-691 was a second set of indictments stemming from the June 25 arrest and search, that included two charges, one count for manufacturing, selling, or delivering a Schedule IV narcotic and one count for being a felon in possession of a handgun. The State stated in the motion that joinder was mandatory as both indictments arose out of the same criminal episode. It explained that the Tennessee Bureau of Investigation ("TBI") had not originally tested all of the pills and that, after so doing, the State sought additional charges based on those findings and also on the Defendant's status as a convicted felon.

The trial court held a hearing on the motion on July 29, 2020. The State reminded the trial court that, in the first search warrant, Deputy Graham incorrectly said in his search warrant application that the phones were found "on the Defendant" when they were found in the hotel room. The State asserted that it then sought a second search warrant that corrected that fact, and the trial court granted that second search warrant. The evidence found on the phones was therefore admissible pursuant to the second search warrant. The Defendant argued that the second search warrant contained misstatements of facts, in part because it said that Officer Knoblock smelled marijuana, a fact that the officer denied at the previous hearing.

7

The State called Officer Christopher Nolder, also with the CPD, who testified that a representative from the District Attorney's office notified him that there were misstatements in the first search warrant for the cell phones. He prepared a second search warrant in which he corrected the misstatements. The trial court granted the second search warrant on October 10, 2019, and Officer Nolder testified that the information in the second search warrant was all accurate. On October 15, 2019, after receiving the approval of the second search warrant, Officer Nolder, assisted by Detective Kolosky, searched the cell phones found in the motel room.

During cross-examination, Officer Nolder said he created the second search warrant based on the first, with the exception of the misstatement. He included in the search warrant that Officer Knoblock smelled the odor of marijuana coming from the room, and he was unaware that Officer Knoblock may have said something contrary to this at the November 5, 2019 hearing. He said he did not tell the judge that he was filing the second search warrant because of the misstatements in the first, and the judge may have found that relevant in making his decision.

Officer Knoblock testified that he had been accused of false testimony about whether he smelled marijuana coming from the hotel room because he can be heard on one of the officer's in-car recordings saying that he did not smell marijuana. He explained that, when he was speaking in the recording to his supervisor, he was recounting the story. He initially thought that the odor of cigarettes was coming from the room because the door was not yet opened. After being next to the door, and before entering the room, he smelled marijuana. He stated that his statements were not inconsistent.

Deputy Graham also testified again and said that he did not respond to the scene, but he interviewed the Defendant and Ms. Hale. The two were located in separate, but adjacent, rooms. The two attempted to speak to each other through the walls, so he had to separate them.

Deputy Graham said that he filed the first affidavit for a search warrant. In it, he made the statement that the cell phones were found on the Defendant's person, which was inaccurate. He explained that he assumed that the phones belonged to the Defendant because, during his interview, the Defendant asked for his phone to call the person to whom the money found belonged. Based on this assumption, Deputy Graham wrote down the wrong information in his notes that he subsequently used to create the affidavit.

Deputy Graham said that, later, the ADA informed him of the error, the State conceded the motion to suppress, and the State sought a second search warrant for the phones based upon accurate information. He recalled that there were illegal drugs found in the hotel room, along with the phones. He stated that he at no point intended to deceive the court.

During cross-examination, Deputy Graham said he had photographed six phones at the scene. He said that he assumed that the Defendant's was the "little phone" because that was how the Defendant described it in the interview when he asked to use it and contact the money owner. Deputy Graham said that he only searched two of the six phones because all the information indicated that the Defendant was the owner of the drugs and that he was also the owner of the two phones. The deputy therefore did not seek a warrant for the other phones.

Deputy Graham agreed that he misspoke when he said in the warrant that the Defendant had pills on him, when in fact the Defendant had a pill bottle on him. The pills were found inside the hotel room. He similarly stated that the Defendant was found in possession of $771, when that money was actually found in the hotel room.

During redirect examination, Deputy Graham testified that he believed all of the statements in the affidavit when he swore to them. He said that he based his belief on statements of other officers who had responded to the scene and statements by the Defendant during their interview.

The trial court denied the Defendant's motion to suppress. It agreed with the State that joinder of the cases for trial was required.


**B. Trial**


On November 16, 2020, the parties convened for trial. The State informed the trial court that it was not proceeding with prosecuting one of the aggravated assault charges, the count based on strangulation, because of the evidence as it existed. The trial court dismissed this count. The Defendant moved to bifurcate two of the counts because the charges were based on the Defendant's prior criminal history. The trial court then noted that the two charges in case number CC-2020-CR-691 became counts fourteen and fifteen. It then noted that all the counts had to be renumbered.

According to the renumbering, the following charges were presented to the jury in the first part of the bifurcated trial: Count 1 aggravated assault by use or display of a weapon, Count 2 especially aggravated kidnapping, Count 3 resisting arrest, Count 4 possession with intent to manufacture, sell or deliver heroin, Count 5 possession with intent to manufacture, sell or deliver marijuana, Count 6 possession with intent to manufacture, sell or deliver Schedule IV Diazepam (Valium), Count 7 possession with intent to sell or deliver Clonazepam, Count 8 possession with intent to sell or deliver Schedule IV drug Alprazolam (Xanax), Count 9 possession of drug paraphernalia, Count 10 possession of a firearm with intent to go armed during a dangerous felony; and Count 11 possession with intent to sell or deliver a Schedule IV controlled substance, Cathine.

9

The parties then presented the following evidence: On June 25, 2018, the manager at the Super 8 Motel where these events occurred heard a "lot of racket" that sounded like someone fighting emanating from room 148, the room in which the Defendant was located. She called 911 after determining that the situation was greater than she could handle alone. She was not present outside the room when law enforcement arrived.

Law enforcement officers asked the manager for the registration of the room. The room was registered to "Roy Henries," and he rented the room from June 23 until June 26. Notations on the registration included that the room was going to be used by his niece, "Kelsey". During cross-examination, the manager testified that the Super 8 Motel was located near the CPD station and also near several other motels.

Mr. Roy Henries confirmed that he rented the motel room for the Defendant in June 2018 because the Defendant did not have any identification at that time. He said that he had known the Defendant, who referred to him as "Uncle Roy," for a "long time" through family friends. The Defendant reimbursed Mr. Henries for the room expense. Mr. Henries admitted that he told the rental agent that he was renting the room for a young lady who was with him, and he did not remember her name, but he was actually renting it for the Defendant.

During cross-examination, Mr. Henries said he gave the young lady both keys to the room and never gave them to the Defendant. Mr. Henries said that he also knew Ms. Hale and Mr. Ingraham, and he had seen Mr. Ingraham at the motel room and was under the impression that Mr. Ingraham was also staying in the motel room. Mr. Henries said that he was under the influence of opiates at the time he spoke with police in this case, but he also admitted that he told them he had rented the room for "Chris."

During redirect examination, Mr. Henries agreed that he rented the room for the Defendant and said he previously testified that he gave the keys for the room to the Defendant. He also said that he and Mr. Ingraham returned to the motel after the Defendant's arrest to retrieve Mr. Ingraham's personal belongings that were still in the motel room.

Multiple CPD officers responding to Ms. Moyer's 911 call testified and they testified in conformity with their testimony at the suppression hearing. Officer Clegg testified that he responded to a 911 call at the Super 8 Motel about a possible domestic assault situation on June 25, 2018. He was the first officer to respond at around 5:30 p.m. which was close to shift change, and, due to the nature of the call, he parked some distance from the room and listened from outside the room for some period of time. Upon hearing nothing, he knocked on the door of the room. Mr. Ingraham answered the door, leaving the door open, and the officer asked him about the sounds of argument from within. Mr. Ingraham said that his "boy and his girlfriend" were arguing but that the "girl" was heading toward another hotel somewhere. Officer Clegg said that he and Mr. Ingraham spoke for

10

between five and ten minutes. As the two were speaking, the Defendant exited the room and headed toward a car that was parked directly in front of the room. The Defendant opened the car door, did something in the car, and then returned and reentered the motel room. The Defendant exited the motel room again and started his vehicle. As Officer Clegg believed him to be involved in the altercation, he radioed other officers to ensure that the Defendant did not leave the premises.

While the Defendant was in a patrol car, Officer Clegg asked Mr. Ingraham for consent to search his person. Mr. Ingraham agreed, and the officer found nothing illegal on Mr. Ingraham during this initial search.

Officer Kozial and Officer Mann also responded to the Super 8 Motel in response to the 911 call. When they arrived, Officer Clegg was already there speaking with Mr. Ingraham at the door of the motel room. Both officers heard Officer Clegg's call for someone to stop the Defendant in his vehicle. Officer Mann approached the driver's side of the Defendant's vehicle first while Officer Kozial gave the license plate number of the vehicle the Defendant was in to dispatch. Officer Kozial then joined Officer Mann, and he asked the Defendant to place the car in park and turn off the ignition. Officer Kozial stayed with the Defendant, and Officer Mann went across the street to contact the Defendant's girlfriend, where Mr. Ingraham indicated that she would be located.

Officer Mann found Ms. Hale in front of the Americas Best Value Inn holding a bag and standing with her mother. She seemed "frantic," and the officer noted bruising around her neck, so Officer Mann asked her if she had been involved in the incident across the street. Ms. Hale told Officer Mann that the Defendant had picked her up, and she thought he was taking her to the W.I.C. office. She told him that she thought there was going to be "a domestic today," which he understood to mean that she anticipated the altercation with the Defendant. She indicated to the officer that she did not call the police and did not want to file a police report. Ms. Hale did, however, provide him some details of what had happened during the altercation, including that she was at the Super 8 Motel for approximately four hours, and the officer asked her to come back across the street with him. Officer Mann went back to the crime scene and left Ms. Hale in his vehicle while he continued assisting with the investigation.

While Officer Mann was speaking with Ms. Hale, Officer Kozial was speaking with the Defendant. When asked, the Defendant told Officer Kozial that his name was "Jordan" and said that he did not have any identification with him. The officers asked the Defendant to exit the vehicle, and, when he did, his identification fell on the ground, and the Defendant quickly retrieved it and placed it in his pocket. As the Defendant bent over, Officer Kozial noticed a prescription pill bottle in his pocket, and asked the Defendant about it. The Defendant told him that it was a "blunt," meaning a marijuana cigarette. The Defendant handed Officer Kozial the bottle, and the officer noted that the bottle did in fact appear to

11

contain a marijuana cigarette. Officer Knoblock said that officers also found "a wad of cash" and a room key on the Defendant's person.

Officer Kozial patted down the Defendant at that point, and found the Defendant's Tennessee identification, which listed his name as "Anthony Gray." At that point, Officer Kozial detained the Defendant for criminal impersonation for giving a false name and simple possession of marijuana. As Officer Kozial began walking the Defendant toward the back of the patrol car to put him into custody, the Defendant began resisting. Officer Knoblock arrived at that time and assisted Officer Kozial in placing the Defendant into handcuffs. The officers placed the Defendant into Officer Knoblock's patrol vehicle. Because of the shift change, and Officer Kozial's departure from duty at 6:00 p.m., Officer Knoblock took over.

Officer Knoblock recalled Mr. Ingraham asking for the keys to Defendant's vehicle, which was a rental car. One of the officers verified the paperwork showing that Mr. Ingraham had rented the vehicle, and the officers returned the keys to Mr. Ingraham.

Officer Mann saw Mr. Ingraham return to the motel room. He stopped him and confronted him, asking if he had taken anything illegal or otherwise out of the room. Mr. Ingraham admitted to Officer Mann that he had taken a revolver from the room, which was now located in his waistband. Officer Kozial, who was still at the scene, removed the revolver and placed it on the hood of the nearby vehicle. He noted that the revolver was loaded, so he unloaded the weapon. Officer Kozial said that he had not seen Mr. Ingraham go back into the motel room, but he assisted Officer Mann after the discovery of the weapon. Officer Mann placed Mr. Ingraham in the back of a police vehicle parked adjacent to his, so he could watch both Mr. Ingraham and Ms. Hale simultaneously. Officer Knoblock noticed bruising and possible bite marks on Ms. Hale.

After discovering the weapon, Officer Kozial and Officer Knoblock entered the motel room to do a "protective sweep" and ensure that there was no one else in the room. As Officer Kozial was leaving the room, he saw blue and yellow pills on the dresser and in an open drawer. Officer Knoblock also saw in plain view a bag that he suspected contained marijuana. He also saw a plastic grocery store bag in which appeared to contain marijuana cigarettes. Additionally, officers saw multiple pills, some of which appeared to be individually packaged.

After doing a more thorough search of the motel room, officers found two touch screen smartphones and additional pills that appeared to match the ones they had previously seen scattered about the room. Officers found an unopened bag of syringes, a small pink bag that contained more pills, and a box of sandwich baggies in the room.

Officer Knoblock also found a flip-phone in the rental car. Officers found a fourth cell phone, but none was sure whether the fourth phone was found in the rental car or the

12

motel room. Officer Knoblock collected everything he believed had evidentiary value and transferred it to Agent Graham, including the suspected drugs, the gun, bullets, phones, and cash. Officer Knoblock identified the evidence collected, and the trial court admitted it into evidence, and the jury viewed it.

During cross-examination, Officer Kozial testified that he later learned that Mr. Ingraham had removed evidence from the motel room, but he personally never saw Mr. Ingraham enter or exit the motel room. Officer Kozial agreed that Mr. Ingraham should not have been allowed to enter and exit the motel room. During the cross-examination of Officer Clegg, he agreed that Mr. Ingraham could have brought drugs into the motel room while the officer was watching the Defendant. Officer Mann said during cross-examination that he was not present when the Defendant was taken into custody because he was across the street speaking to Ms. Hale. He agreed Ms. Hale did not mention a handgun when she recounted the events. She also refused to give a written statement. Officer Knoblock was unsure whether a phone was found on the Defendant's person when he was searched. Officer Knoblock agreed that Ms. Hale did not tell him about the gun until after officers discovered it. She then identified it as belonging to the Defendant. He agreed that a majority of the narcotics found were found in a blue and white backpack, which was located by the door of the motel room. Officer Knoblock also agreed that Mr. Ingraham had a keycard to the room, was going in and out of the room, and could have put drugs in the motel room.

Chris Ingraham testified and recalled the events surrounding the Defendant's arrest. He said that, at the time, he had known the Defendant for over two years through the Defendant's uncle, A.J. He met Ms. Hale through the Defendant. Mr. Ingraham acknowledged that he was currently incarcerated on charges that he tampered with the evidence in this case because he retrieved a gun from the motel room and left with the weapon. Mr. Ingraham said that the State agreed to drop the charge against him in exchange for his truthful testimony at the Defendant's trial. Mr. Ingraham also acknowledged that he had two previous theft convictions and one pending charge against him in Mississippi.

Mr. Ingraham said that on June 25, 2018, he went to the Super 8 Motel room to see the Defendant. He explained that he had allowed the Defendant to use a rental car rented in Mr. Ingraham's name, and the rental had to be returned that day by the close of business, which was about 5:00 or 5:30 p.m. The Defendant had had the car for about three days. When he arrived at the hotel room, the Defendant and Ms. Hale exited the room arguing. She left headed in the direction of two other hotels. Mr. Ingraham said he went to his vehicle and retrieved a chessboard and put it in the motel room. He noted that the Defendant was still "mad," and Mr. Ingraham saw that he still had multiple items in the rental car. The Defendant began removing items from the car and putting them inside the hotel room. Mr. Ingraham followed the Defendant into the motel room with his chessboard. He put down his cigarettes and lighter, and he noticed that the room contained

a lot of clothing and purses.  The police knocked on the door.  He said he was only at the room for ten to fifteen minutes before the police arrived.

Mr. Ingraham said that the Defendant had just received a phone call and was walking toward the back of the motel room, so he answered the door.  Mr. Ingraham said that the officer said that he was there in response to a domestic disturbance, and Mr. Ingraham attempted to help the officer by showing him a picture of Ms. Hale and pointing out the direction in which she had left.  The Defendant got into the rental vehicle and attempted to leave until other officers stopped him.

Mr. Ingraham said he never stayed in the motel room, and he did not have a key card to the room.  He said that he returned to the room after the Defendant was in custody.  The first time, he attempted to find a phone charger.  The officer then told him that he could go home, but, after realizing that he left his cigarettes and lighter in the motel room, he returned to the motel room.  He found his cigarettes but could not find his lighter.  He left the room, and then returned to the motel room a third time to find his lighter.  When he looked in the nightstand he saw a silver revolver with a black handle on the bed.  He grabbed the weapon and holstered it in the front of his pants.  He then left the motel room again.  An officer stopped him, asked him if he had taken anything from the room, and, after initially saying he had not, Mr. Ingraham told him that he had taken the weapon.

Mr. Ingraham said that he picked up the weapon in hopes that the Defendant would not be charged with having the weapon.  Mr. Ingraham said that, at the time, he was under the influence of heroin and marijuana.  He purchased some of the drugs he consumed from the Defendant.  He assumed that drug sales were the Defendant's only source of income.

During cross-examination, Mr. Ingraham testified that officers did not search him until he came out of the room on the fourth occasion.

Ms. Hale testified that, before this incident, she had known the Defendant for approximately seven months.  She called him "T.J." and she knew he had another nickname, "Dolo."  They were friends for a short period of time and then began dating but had broken up before the incident but maintained an intermittent relationship.  She described their relationship after breaking up as "strictly sexual."

Ms. Hale said the Defendant did not have a job but received money from the sales of drugs.  She was unsure about what drugs, if any, he sold other than marijuana, but she explained that she met him when she purchased marijuana from him.  Around the time of this incident, Ms. Hale used Xanax, smoked marijuana, and drank alcohol.

Ms. Hale described the day leading to her being in the motel with the Defendant.  She said that the two spoke electronically, she was not sure whether by phone or Facebook messenger, and she asked the Defendant to take her to a doctor's appointment.  The

Defendant picked her up in a rental car between noon and 2:00 p.m. The Defendant said that he needed to go to his motel room, and she assumed that they would go there and have sexual intercourse and then he would take her to her appointment.

Ms. Hale recalled that from the moment she got into the vehicle, the Defendant was angry. He thought that she had been cheating on him, so the two got into an argument with him yelling at her. She attempted to exit the vehicle, and the Defendant grabbed her by the hair, pulled her back into the vehicle, and said, "It's a good day to catch a domestic." She understood this to mean that he was going to "put his hands on" her and that he was angry enough to go to jail over it.

Once at the motel, Ms. Hale went into the room voluntarily, still thinking that the two were going to engage in sexual intercourse. Ms. Hale acknowledged that she went with the Defendant willingly even after he had violently pulled her hair. She said that she was in love with the Defendant at the time, she was young and impressionable, and her mother had always been with violent men, so Ms. Hale felt the Defendant's behavior was normal. After entering the room, the Defendant immediately began "interrogat[ing]" her about who she was seeing, sending electronic messages, and her whereabouts. Ms. Hale explained that the Defendant had linked her and his Google accounts, so he could pull up her information on his phone, and he questioned her about it. She said that, if she did not provide the "right answers," he became more violent and physical. Ms. Hale said, at that point, she attempted to leave the room.

The Defendant prevented Ms. Hale's attempt to leave on multiple occasions by dragging her by her arms or her legs back to the bed. She tried to call her mom and 911, but he "snatched" the phone cord out of the jack. The Defendant did not allow her to make a phone call. The Defendant held Ms. Hale on the bed by sitting on top of her, legs on either side of her, and squeezing the tops of her arms tightly. She said she also had marks on her neck, but she did not explain what caused them, becoming more vague during questioning. Ms. Hale said she screamed loudly during this incident in hopes that someone would hear her and send help. This went on for two or three hours, and she even resorted to hitting the Defendant's "bad leg" in hopes that she would be able to leave.

At one point, the Defendant brandished a gun from his bag and started waving it around and threatening her. She identified a photograph of the weapon. While waving the gun, the Defendant told her, "This isn't a game to me." He also uttered "a lot of crazy ramblings." Ms. Hale said she was crying, and the Defendant said he wanted to play Russian roulette with her. Ms. Hale said that she reacted quickly and started screaming at him. She took the gun away from him and threw it under the sink. She said the Defendant was not holding her down at this point, but she stayed because he was waving the gun around. She said she was terrified.

15

Ms. Hale acknowledged that, during this time period, she had sex with the Defendant willingly. She said that she thought that, if they had sex, the incident would be over. She also said she never successfully left the room after multiple attempts. When Mr. Ingraham arrived the Defendant opened the door. The Defendant released Ms. Hale, and she was able to leave the motel room. She said she ran under the Defendant's arm as it was propping the door open. Mr. Ingraham asked her if she was okay and if she needed a ride, and she told him she did not need anything. She just wanted to go call her mom. Ms. Hale went across the street to another motel and called her mother, who came to get her.

Ms. Hale agreed that there was a police station across the street from the Super 8 Motel, but she said that she chose not to go there and went to another motel instead. She said that, in her youth, she equated love with loyalty. It had been ingrained in her that you did not call the police on your significant other, ever, no matter the circumstances.

Ms. Hale said that, because she did not call the police, she was surprised when Officer Mann arrived at the motel where she called her mother. He told her that he was there about a domestic disturbance and, from the bruising on her body, he assumed she was the other person involved in the altercation. Ms. Hale said she agreed to talk to him and allowed him to take pictures of her injuries.

Ms. Hale described her injuries, saying that she had bruises all over her body. Specifically, she had bruising and bite marks on her inner thighs, one of which left a scar. She also had bruises and bite marks on her neck. At the end of her testimony, Ms. Hale identified Snapchat videos from the Defendant's phone that showed the inside of the Super 8 Motel room. She can be heard crying on the videos.

Ms. Hale said she had contacted the Defendant since this incident. She said that she entered a drug rehabilitation program and, as part of her treatment, she wrote him a lengthy letter in which she apologized for her wrongdoing and indicated that she forgave him for this incident. The Defendant contacted her, and the two spoke. The Defendant would talk to her about the case, but she emphasized that her desire was to tell the truth in court.

Ms. Hale discussed her previous criminal history which included some drug charges that she received around the time of this incident. She was serving a probationary sentence and would get judicial diversion if she successfully completed diversion. She had also been charged with the domestic assault of her mother.

During cross-examination, she expounded that her conviction was for the felony resale of Xanax. She also had a pending charge in Texas for the resale of pills from the same time period. Ms. Hale agreed that, during this incident, she fought back with the Defendant. She said that she had a newborn child at the time, and the child was living with her grandmother. Ms. Hale was under investigation by the Department of Children's Services because there were drugs found in the child's system around the time of his birth.

Ms. Hale agreed that she had previously testified that she and the Defendant did not have sex that day. She also previously testified that she did not see him point the gun at her, although she said he had a gun in his hand while they were arguing. She explained any discrepancies in her testimony by saying that she was still loyal to the Defendant during her previous testimony and now she just wanted to be truthful.

Crystal Myers, a public defender, testified that she represented Ms. Hale for a probation violation. She saw her June 28, 2017, three days after this incident, when Ms. Hale came for an appointment. Ms. Myers recalled that Ms. Hale, who she estimated weighed ninety pounds, was wearing a tank top and long shorts. Her arms were "absolutely covered" in black and purple bruises. There were both cluster and circle bruises on her arms.

During cross-examination, Ms. Myers testified that Ms. Hale had been convicted of reselling Xanax. Ms. Myers also said that her office had previously represented the Defendant. When she learned this, she withdrew from representing Ms. Hale.

Officer Graham testified about the physical evidence in this case, which he received from Officer Knoblock. He took the evidence, photographed it, and the trial court admitted those photographs into evidence. Officers submitted a total of six cell phones in this case. One of the phones belonged to Ms. Hale, and he returned it to her. Another belonged to Mr. Ingraham, who was taken into custody.

Officer Graham interviewed the Defendant, Mr. Ingraham, and Ms. Hale while they were at the police station. He noticed that Ms. Hale had bruises over her arms and legs and also around her neck. The officer photographed her injuries, and noted that Ms. Hale seemed "very upset" about the whole situation. Officer Graham recalled that Ms. Hale and the Defendant, who were in separate rooms, communicated through their interview rooms. They were shouting at each other and appeared to be trying to have a conversation about the incident. The officers separated the two into rooms from which they could not communicate through the walls.

Officer Graham said that, when he interviewed the Defendant, the Defendant did not offer any place of employment. The Defendant admitted that he had been at the Super 8 Motel with "his girl" and "some other people" but would not provide any names. The Defendant was unresponsive when Officer Graham asked him if Mr. Ingraham was also staying in the motel room.

Officer Graham sealed the physical evidence and sent it to the TBI to be tested. Special Agent Jennifer Sullivan with the TBI tested the evidence in this case. Her testing revealed that the evidence submitted included: 12.22 grams of heroin and fentanyl, 96.71 grams of marijuana, 60 Diazepam tablets, 15 Klonopin tablets, four Xanax tablets, 13

17

Clonazepam tablets, and 297 Cathine tablets. Special Agent Sullivan said that there was additional material submitted that she believed to be marijuana, but she did not test it as the first bag submitted exceeded the first threshold. It was apparent to her that there was not enough marijuana to meet the next threshold, which was ten pounds.

During cross-examination, Special Agent Sullivan said that of each of the pills marked the same, she tested one to determine what substance that pill contained. She did not test every single pill.

CPD Detective Debra Kolofsky, an expert mobile phone forensic examiner, identified a flip-phone submitted as evidence in this case. She described the flip-phone as "low tech" and inexpensive. In text messages on the phone, it appeared the user was named, "Dolo," and the phone was last was used on June 25, 2018. Detective Kolofsky also conducted a forensic examination of one of the smartphones. After looking at the accounts associated with the phone, she determined that the Defendant was its primary user. The phone memory also contained a picture of the Defendant that he appeared to take of himself on June 25, 2018 and some Snapchat videos. Around the date of this incident, there were also text messages that appeared to indicate drug activity. Agent Graham identified two search warrants in this case for the cell phones, one dated August 8, 2018, and the other dated October 10, 2019.

Will Meeks, the senior drug agent with the CPD, testified that he looked at multiple circumstances to indicate whether someone was involved in the sale of drugs. Some of those factors included: how they were working in our community; whether they possessed used and unused baggies; the types of baggies and packaging they possessed; and whether the person had digital scales, smoking apparatuses and or syringes. He also said that it was significant that the Defendant in this case was in a hotel room rented in someone else's name, which drug dealers sometimes did as an attempt to conceal themselves. Drug dealers would also sometimes drive rented vehicles to conceal their identity. Agent Meeks also indicated that those engaging in drug dealing also carried cash currency, as narcotics selling was a cash-based business.

Agent Meeks found indications of drug sales in the photographs of the motel room. He noted the sandwich baggies, the cigarette wrapping paper, and the marijuana packaging, which appeared to be for resale. The agent estimated the value of the drugs found. He said that the 12.2 grams of heroin had a street value of $2400 and that the 192 grams of marijuana had a value of between $1500 and $2000. He estimated that many of the pills would have a value of $7.00 per pill and the quantities of the pills indicated that they were for resale. Agent Meeks indicated that all of the factors indicate that the items in the motel room were associated with drug dealing, except for the burnt portions of the marijuana cigarettes, which were for personal use.

18

During cross-examination the agent agreed that no digital scales were found in the motel room.

Kelsey Vance testified on behalf of the Defendant and said that she and the Defendant were "hanging out" in June 2018. On June 24, 2018, she was at the Super 8 Motel with the Defendant along with Mr. Ingraham. She spent the night at the motel with the Defendant and Mr. Ingraham, and during that time, she never saw drugs being sold from the motel room and she also never saw a weapon. Ms. Vance identified a photograph of her and the Defendant from that day, and she said Mr. Ingraham took the photograph. She said Mr. Ingraham had a keycard for the room, and he came and went as he pleased.

During cross-examination, Ms. Vance agreed that she had spoken with the Defendant while he was incarcerated, and the two talked by phone twice the weekend before the trial. The two discussed whether she would testify. After listening to a recording from the jail telephone, she agreed that she asked the Defendant, "I'm supposed to know what Chris looks like, right?" She also said, "Chris is in jail, so I know Chris." The State's attorney then asked her to describe Chris, and she said he was light-skinned with light eyes. She denied that she only knew what he looked like from his booking photograph.

After listening to another recording, Ms. Vance agreed she called the Defendant "Dolo." She also listened to a recording of her speaking with a woman named "Brook" from the jail. "Brook" told Ms. Vance to testify that, "It was the plug[4] that was taking the pictures."

Ms. Vance agreed that she stayed in the room on June 23, which was her birthday, and also on June 24. She did not see a gun or drugs, and the room was not in disarray. She left around 8:00 a.m. on June 25. The photographs on the phone depicting her and the Defendant were from her birthday weekend.

During redirect examination, Ms. Vance agreed that she had previously spoken with the Defendant's investigator, before these jail house calls, and her statements were consistent with her testimony. She disagreed that the Defendant tried to get her to testify that Mr. Ingraham was "the plug."

The investigator in the Defendant's case, James North, testified that Ms. Vance's statements to him from months before the trial were consistent with her trial testimony.

The Defendant testified that he was twenty-eight years old at the time of trial and had previously been convicted of multiple felonies, including facilitation of robbery, aggravated robbery, and being a felon in possession of a firearm.

---

[4]Earlier in her testimony, Ms. Vance explained that a "plug" in street terms is one who does illegal activity.

The Defendant explained this incident by saying that he picked up Ms. Hale because he wanted to have sex with her. He brought her to the motel room, had sexual intercourse with her, and he fell asleep. He awoke to her going through his phone, seeing pictures of him with another female the day before, and asking who he was with and why it was not Ms. Hale. The Defendant agreed that the photographs on his phone were provocative, which made Ms. Hale angry. He said Ms. Hale also saw videos on his phone that showed the Defendant and Mr. Ingraham having sex with Ms. Vance. There were multiple other photographs of women on his phone that Ms. Hale also saw.

The Defendant denied every assaulting Ms. Hale while he drove her to the motel room. He also denied taking the route that she said that they took, explaining that he only took back roads because he did not have a valid driver's license.

He described the incident saying that, after seeing the photos on his phone, Ms. Hale started looking into dressers and slinging things around. He said she was "cussing" at him. The Defendant argued that Ms. Hale could not be upset with him because she was doing inappropriate things to obtain drugs. The Defendant said that the most serious part of the argument occurred approximately thirty minutes before Mr. Ingraham arrived at the motel room. He had locked Ms. Vance's possessions in the bathroom, and Ms. Hale was beating down the door attempting to get into the bathroom.

The Defendant said that Ms. Hale hit him first and that he never hit her. He said he did grab her when she was trying to break down the bathroom door, and he put her on the bed. He said that he also bit her, but did so in response to Ms. Hale hitting his face and choking him.

The Defendant said that there was no gun in the motel room, and he never pulled a gun out on Ms. Hale. He identified the weapon in this case and said that it belonged to Mr. Ingraham. The Defendant said he asked the State to test the gun for fingerprints, but it refused.

The Defendant said that he told Ms. Hale that it was time to leave when Mr. Ingraham arrived. He did not want to leave her in the motel room because he believed she would try to beat down the bathroom door because she believed there was someone hiding inside the bathroom. She was upset about leaving because she had nowhere else to stay.

The Defendant recalled that Ms. Hale had smoked "fake" marijuana and consumed some Xanax the day of the incident. He said that she had attacked him before but he never called the police. The Defendant admitted that he was a "drug dealer" at the time of this incident and that he had marijuana, Xanax, and pain pills in the motel room. The Defendant said that he purchased drugs from Mr. Ingraham, who was a "bigger" drug dealer than he was. Ms. Hale also sold drugs for the Defendant.

20

The Defendant said that he, Roy Henries, and Ms. Vance all had keycards to the motel room. When Mr. Ingraham came to town, he also got a keycard to the room. The Defendant said that the book bag that the State introduced into evidence belonged to Mr. Ingraham. The Defendant said that he was purchasing drugs from Mr. Ingraham when police arrived.

The Defendant agreed he gave police a fake name and that he had a pill bottle with a marijuana cigarette and some Xanax on his person when police stopped him. He ingested the Xanax while in the police car, so he was not sober during the interview. The Defendant said that he only owned one of the cell phones that police confiscated. The Defendant said Ms. Hale had "fabricated" the testimony that she took a gun from him.

During cross-examination, the Defendant agreed that his testimony about the incident was contrary to the majority of the other witnesses, but he maintained that they were all lying. The Defendant agreed that, in the motel room, he possessed the three bags of marijuana found by law enforcement in the room. He also had Xanax pills, which he consumed before they were discovered by law enforcement. He said that he also had Viagra pills in the room, but he denied ownership of any of the other pills found in the room. He said that the large quantity of blue pills found in the white bag did not belong to him. The Defendant did not recall a phone conversation with Ms. Hale after his arrest during which he told her that he was lucky that law enforcement officers did not test those pills because it would be "a lot worse."

The Defendant agreed that he sold drugs as his only source of income and described his role as a "middle man," selling Lortab, Xanax, "Roxys," and anything that he could. The day of this incident, he had purchased some heroin from Mr. Ingraham to resell, but Mr. Ingraham had not given him the right quantity. Mr. Ingraham came to the motel room to give him the rest of the heroin that the Defendant had purchased for resale. The Defendant said that the $700 found with him was his, but he agreed that he repeatedly told police that it belonged to his uncle. The Defendant said that he was "shocked" when he first heard about the quantity of pills and heroin that he was being charged with because he did not have those in the room. The drugs found in the backpack belonged to Mr. Ingraham, as did the backpack itself.

He also agreed that he had a physical altercation with Ms. Hale. He said that he held her only hard enough to get her to stop kicking the bathroom door. He explained that he only bit her because she knew that his leg was injured but stayed on top of him and biting her was his only recourse.

The Defendant said that Officer Clegg lied when he first arrived at the room and said he was investigating a domestic disturbance. The Defendant opined that Ms. Hale had

called the police to report drug activity in the Defendant's motel room and that the officer was there to investigate that.

The jury convicted the Defendant of assault, kidnapping, possession with intent to sell or deliver heroin, four counts of possession with the intent to sell or deliver four different scheduled drugs, and possession of drug paraphernalia. The trial court sentenced him as a Multiple Offender to an effective sentence of fourteen years of incarceration. It is from these judgments that the Defendant now appeals

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to sever his offenses; (2) the trial court erred when it denied his motion to suppress evidence found during the search of a hotel room; (3) the trial court erred with it denied his motion to suppress evidence obtained from the search of two cell phones; (4) the State violated his right to due process by intentionally allowing false testimony; (5) the trial court erred when it denied his motion for a judgment of acquittal; (6) the evidence was insufficient to sustain his convictions; and (7) the trial court erred when it denied his motion for new trial.

We first note that the State contends that the Defendant waived each one of his issues by failing to cite to the appellate record. The State correctly notes that Rule 27(a)(7)(A) of the Tennessee Rules of Appellate Procedure provides that a brief "shall" contain" an argument with "citations to the authorities and appropriate references to the record." Further, the rules of this court provide that issues not supported by references to the record will be treated as waived. *See* Tenn. R. Ct. Crim. App. 10(b).

After reviewing the Defendant's brief, we find that he did make some citations to the record. While we encourage parties to be more precise in their citations, we conclude that we can aptly review his issues on their merits based upon the Defendant's brief.

### A. Severance of Offenses

The Defendant contends that the trial court erred when it did not sever his drug-related charges from the kidnapping and assault charges. The State counters that the offenses were properly joined by the trial court.

On October 19, 2019, the Defendant filed a motion to sever the sets of offenses pursuant to Tennessee Rule of Criminal Procedure 14(b)(1). He contended that, if "permissive joinder" applied in this case, pursuant to Tennessee Rule of Criminal Procedure 8(b), then joinder of the offenses was improper because, pursuant to Rule 14(b)(1), the crimes were not part of the same criminal episode and proof of one count was not admissible in a trial of the other counts. The State contended that the mandatory joinder

rule of Tennessee Rule of Criminal Procedure 8(a) applied, and the Defendant countered that the trial court should then sever the offenses pursuant to Rule 14(b)(2). After a hearing, the trial court found that the offenses arose out the same criminal episode, starting with a complaint regarding the domestic disturbance. The court stated that Ms. Hale, the other party involved in the disturbance, connected the Defendant to the handgun in the room, as well as the drugs in the room. Because of the connection of the offenses, the trial court denied the Defendant's motion to sever.

The State asserts that the Defendant waived this issue by failing to raise it in his motion for a new trial. The Defendant concedes as much, but asks us to review this issue for plain error. We agree that full appellate review of this issue is waived because the Defendant failed to raise the issue in his motion for new trial. *See* Tenn. R. App. P. 3(e). Therefore, we review this issue solely to determine if plain error review is warranted.

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id*. at 231. When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The record clearly establishes what occurred in the trial court in this case. The arguments of the parties rely upon what occurred during the trial, which was adequately transcribed and preserved for our review. The first element of plain error review is satisfied. *See Smith*, 24 S.W.3d at 282.

Next, we determine whether a clear and unequivocal rule of law has been broken. *Id*. Decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). "[A] trial court's refusal to sever offenses will be reversed only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Spicer v. State*, 12 S.W.3d 438, 442-43

(Tenn. 2000) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)); *see also Shirley*, 6 S.W.3d at 247. Discretion is also abused when the trial court "failed to consider the relevant factors provided by higher courts as guidance for determining an issue." *State v. Garrett*, 331 S.W.3d 392, 401 (Tenn. 2011) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The consolidation of multiple offenses against a single defendant in a single trial is governed by the interplay of Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure. Rule 8 identifies the circumstances for mandatory joinder and permissive joinder. Under the rule for mandatory joinder:

> (a)(1) Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13, if the offenses are:
> (A) based on the same conduct or arise from the same criminal episode;
> (B) within the jurisdiction of a single court; and
> (C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Multiple offenses arise from the same criminal episode only when "proof of one offense necessarily involves proof of the others." *State v. Johnson*, 342 S.W.3d 468, 475 (Tenn. 2011) (citing 2 ABA Standards for Criminal Justice § 13-1.3 cmt., at 13.10). Stated differently, "the proof of one offense must be 'inextricably connected' with the proof of the other or . . . the proof of one offense [must] form[ ] a 'substantial portion of the proof' of the other offense." *Id.* (citations omitted). Tenn. R. Crim. P. 8(a).

Pursuant to 14(b)(2), if two or more offenses are joined or consolidated for trial pursuant to Rule 8(a), (mandatory joinder), the court shall grant a severance of offenses in any of the following situations:

> (A) Before Trial. Before trial on motion of the state or the defendant when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.

> (B) During Trial. During trial, with consent of the defendant, when the court finds a severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court shall consider whether--in light of the number of offenses charged and the complexity of the evidence--the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

In this case we conclude that the trial court did not abuse it's discretion when it determined that these offenses were subject to mandatory joinder pursuant to Rule 8. These

24

offenses all stemmed from an incident that occurred on a single date, after the police were called for a domestic disturbance. As part of their investigation into the disturbance, officers found drugs in the motel room where the disturbance occurred. The victim, Ms. Hale, was held against her will by the Defendant, who possessed a gun, in the room in which the drugs were found and from which the gun was taken by Mr. Ingraham. Ms. Hale was located and brought by officers immediately to the scene where the Defendant was still located while officers found the drugs and weapon. This all occurred during a three to five-hour timeframe. Ms. Hale gave a statement to police that included allegations that the Defendant was in the motel room with the weapon and the drugs at the time of the domestic-related offenses, and that the weapon was used during the domestic-related offenses. As such, the trial court did not err when it determined that all of the alleged offenses occurred from the same criminal episode. We further conclude that it did not err when it determined that severance was not necessary to achieve a fair determination of the Defendant's guilt or innocence.

Accordingly, the Defendant is not entitled to plain error relief because he has not proven that a clear and unequivocal rule of law was breached. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); *State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018); *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). He is not entitled to relief on this issue.

### B. Motion to Suppress

The Defendant next contends that the trial court erred when it denied his motion to suppress evidence found during the search of the motel room. He assets that Mr. Ingraham was at the motel room only to get his rental car but had no authority to consent to law enforcement searching the motel room. The State counters that Mr. Ingraham had the apparent authority to consent to the search of the motel room, so the trial court property denied the Defendant's motion to suppress.

On review, an appellate court may consider the evidence adduced at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law which we review de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

25

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A similar guarantee is provided in Article 1, Section 7 of the Tennessee Constitution:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose [offenses] are not particularly described and supported by evidence, are dangerous to liberty.

The essence of these constitutional protections is "to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn.1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The prohibition against warrantless searches and seizures is subject only to a few specifically established and well-defined exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). One exception to the general warrant requirement is consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996); *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." *Id.* In most circumstances valid consent exists when given "either by the individual whose property is searched or by a third party who possesses common authority over the premises." *State v. Ellis*, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (citations omitted). The Supreme Court has defined common authority as the

mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

26

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); *see Bartram*, 925 S.W.2d at 231. This court has previously concluded that valid consent exists if (1) the third party in fact had common authority or (2) a reasonable person, given the facts and circumstances available to the police, would have concluded "that the consenting party had authority over the premises." *Ellis*, 89 S.W.3d at 593 (*citing Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990)). Courts consider the reasonableness of an officer's belief under the totality of the circumstances, and no single fact is determinative. *United States v. Rogers*, 861 F. App'x 8, 20 (6th Cir. 2021), *cert. denied sub nom. Ford v. United States*, 142 S. Ct. 1422 (2022); *United States v. Hudson*, 405 F.3d 425, 442-43 (6th Cir. 2005).

The consent doctrine applies to hotel rooms as well as other types of property. *United States v. Saine*, 2022 WL 17000877 (E.D. Tenn. Oct. 27, 2022). "Under the Fourth Amendment, an occupant of a hotel room has a reasonable expectation of privacy there, even though he is just a guest, not an owner, of the room." *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). Thus, a warrantless search of a hotel room is unreasonable unless an exception applies. *Id.* The fact that a person is an overnight guest in a residence or an apartment, standing alone, is sufficient to clothe the guest with a legitimate expectation of privacy in the premises sufficient to challenge the search and any resulting seizure. *State v. Madewell*, No. M2018-00183-CCA-R3-CD, 2018 WL 6566632, at *5 (Tenn. Crim. App. Dec. 12, 2018) (citing *State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996) (citing *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990)), *no perm. app. filed*. The same principles apply to hotel rooms, *see Stoner v. California*, 376 U.S. 483, 490 (1964), and "an occupant of a hotel [r]oom has a reasonable expectation of privacy there, even though he [or she] is just a guest, not an owner, of the [r]oom," *Caldwell*, 518 F.3d at 429. This was holding has been affirmed by the Tennessee Supreme Court. *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001). Indeed, courts have recognized the authority of third-parties sharing hotel rooms to consent to a search of the room even if the room is not registered in their name. *See United States v. Kimoana*, 338 F.3d 1215, 1222 (10th Cir. 2004) ("Although [d]efendant was not the registered guest who had paid for the room, he had stayed there overnight, left his possessions there, and carried a key to the room. This supports a finding that [d]efendant had joint access or control over the room, and thus had actual authority to consent."); *United States v. Clark*, 234 F. Supp. 2d 471, 476-77 (D.N.J. 2002) (third-party had actual authority to consent to search of hotel room where he stayed overnight despite not being a registered guest).

When one occupant of a hotel room consents to a search and another does not, the question is whether the consenting occupant had actual or apparent authority. *Caldwell*, 518 F.3d at 429. The Sixth Circuit has found actual authority to exist when an occupant was a registered guest, placed his or her belongings in the room, spent time in the room, and intended to stay there overnight. *Id.*; *see also United States v. Eastman*, 645 F. App'x 476, 480 (6th Cir. 2016) (finding that "Kellogg had, at a minimum, mutual use of the hotel room sufficient to consent to its search. She paid for the room with her debit card, spent time there earlier in the day, and planned to return in the evening, perhaps to spend the

27

night"); *United States v. Purcell*, 526 F.3d 953, 965 (6th Cir. 2008) (Sutton, J., concurring in part and dissenting in part) (observing that "Crist, to start, had unquestioned authority over the hotel room: She rented the room in her name; she opened the door to the officers; and her personal effects were in the room."); *see also Saine*, 2022 WL 17000877, at *4 (finding that one party had actual and apparent authority to consent to a search of a hotel room when, although not registered in her name, she had been staying in the room, had possession in the room, and had a key and joint access to the room).

In this case, reviewing the evidence presented at the suppression hearing and the trial, we conclude that Mr. Ingraham had actual authority to grant consent to search the room. Law enforcement officers arrived in response to a domestic dispute. Mr. Ingraham answered the door and spoke with law enforcement officers. Mr. Ingraham knew what had happened, and informed the officers that it was a simple dispute between the Defendant and his girlfriend. The Defendant left the room without speaking to officers and was intercepted by law enforcement officers trying to leave the premises. Mr. Ingraham used a key card to go into and out of the room several times during the officers' investigation, and the officers found him in possession of a key card. Mr. Henries, whose name the motel room was registered, told police that he rented the room for "Chris," presumably referring to Chris Ingraham.

During the trial, Mr. Henries, who rented the room, said he saw Mr. Ingraham at the motel and was under the impression that Mr. Ingraham was staying at the motel with the Defendant. Both Ms. Vance and the Defendant testified that Mr. Ingraham had a keycard to the motel room. Ms. Vance said that Mr. Ingraham came and went from the room as he pleased with the keycard, and the Defendant said that, when Mr. Ingraham got into town, the Defendant gave him a keycard to the room. Ms. Vance said that she spent the night of June 24, 2018 in the motel room with "them" referring to Mr. Ingraham and the Defendant. According to the Defendant, at some point during the time she was there, the Defendant, Mr. Ingraham, and Ms. Vance engaged in sexual relations with each other, which the Defendant videotaped. Mr. Ingraham took pictures of the Defendant and Ms. Vance during that time period. Ms. Hale saw videos of these events, which caused the argument leading to the domestic dispute. The Defendant testified that the book bag containing many of the drugs found in the motel room belonged to Mr. Ingraham, along with the gun that officers found in the room. Mr. Henries testified that, after the Defendant's arrest, Mr. Ingraham returned to the motel room to retrieve Mr. Ingraham's personal belongings.

Viewing the evidence adduced during the motion to suppress hearing and the trial, we conclude that the trial court did not err when it denied the Defendant's motion to suppress. The evidence shows that Mr. Ingraham had the actual authority to grant law enforcement officers consent to search the room. There is some evidence that Mr. Henries thought he was renting the room for "Chris," and he thought Mr. Ingraham was staying in the motel room with the Defendant. Mr. Ingraham had a key card to the motel room, came and went has he pleased, possessed items in the room, and spent the night there. He

28

conducted drug related activities from the room during the time that he was there. The evidence indicates that Mr. Ingraham was also staying at the motel room and spent at least one night there with the Defendant and Ms. Vance. As such, he had actual authority to consent to the search of the motel room.

Further, even if Mr. Ingraham did not have actual authority to consent to a search, it was reasonable for police to believe he had such authority under the circumstances, meaning he had the apparent authority to consent to the search. Mr. Ingraham answered the motel room door when officers arrived, and he spoke with them and knew where Ms. Hale had gone. The Defendant told officers that he was at the motel room "visiting a friend," so they did not have knowledge that he had an expectation of privacy to the room. Officers observed Mr. Ingraham going into and out of the room, and after searching him, they found a weapon on his person that he said he removed from the room. It was reasonable for officers to conclude that Mr. Ingraham had authority to consent to the search when he told him that he had left the door open for them. As such, the search of the motel room did not violate the Defendant's Fourth Amendment rights, and he is not entitled to relief on this issue.

### C. Search of Cellphones

The Defendant contends that the trial court erred when it denied his motion to suppress the search of two cellphones. He first summarizes the procedural history of this issue and the arguments he presented before the trial court. In conclusion, he says that the trial court erred when it denied his motion to suppress the evidence found on the two phones because "the warrants were obtained in violation of Tenn. R. Crim. P. 41(e)(3) and T.C.A. ss 40-6-107."

Under Tennessee's Rules of Criminal Procedure, a "warrant must be executed within five days after its date." Tenn. R. Crim. P. 41(e)(3). "[T]here is a rebuttable presumption [in Tennessee] that a warrant served within the statutory five (5) day period retains the probable cause validity attributed to it by the issuing magistrate, subject to a proper evidentiary showing to the contrary." Tennessee Code Annotated section 40-6-107 states: "(a) A search warrant shall be executed and returned to the magistrate by whom it was issued within five (5) days after its date, after which time, unless executed, it is void."

The record is clear that the State executed the search warrant within the applicable five day time frame. The Defendant is not entitled to relief on this issue in that regard. In the Defendant's reply brief he indicates, without further argument, that he reiterates his argument as stated in his brief. While unclear, he appears to be contending, as he did below, that the issuance of the second search warrant was in error because the first warrant contained false information in that it stated the cell phones were found on the Defendant's person when they were found in the motel room, and there was an insufficient nexus between the Defendant and the cellphones. Before the trial court he also argued that the

29

second search warrant contained misstatements of facts, in part because it said that Officer Knoblock smelled marijuana, a fact that the officer denied at the previous hearing.

"A search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." T.C.A. § 40-6-103; *see* Tenn. R. Crim. P. 41(c). Thus, "[a] sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." *State v. Saine*, 297 S.W.3d 199, 205 (Tenn. 2009) (quoting *Henning*, 975 S.W.2d at 294). "Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *Henning*, 975 S.W.2d at 294 (citation omitted). To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized. *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993). A defendant seeking to suppress evidence obtained pursuant to a search warrant bears the burden of establishing by a preponderance of the evidence "the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant." *Henning*, 975 S.W.2d at 298. Determining the existence of probable cause is a mixed question of law and fact that we review de novo. *State v. Reynolds*, 504 S.W.3d 283, 298 (Tenn. 2016).

We conclude that the trial court did not abuse its discretion when it determined that the evidence found on the cellphones need not be suppressed. The phones were confiscated from a motel room where the Defendant was located when law enforcement officers arrived. Also in the motel room were large quantities of drugs. Phones, a communicative device, are often used in an illegal drug sale operation. The affidavit in the first search warrant incorrectly listed the location where the phones were found, and the ADA had an officer correct the affidavit and resubmit that affidavit. As to the Defendant's argument about whether officers smelled marijuana, the officer explained that when the motel door was closed he did not smell marijuana but that when it was opened he did. He said that his testimony and his statements heard on the dash recording were not inconsistent. The Defendant is not entitled to relief on this issue.

### D. Allegedly False Testimony

The Defendant next contends that the State violated his due process rights by intentionally allowing false testimony. He argues that, at trial, Ms. Hale made several false statements during her testimony. He notes that she testified that the terms and conditions of her sentence did not include that the State would dismiss the charge against her if she testified against the Defendant. The Defendant asserts that her guilty plea agreement includes that she "testify, continue cooperation with the District Attorney in Anthony Gray." He further asserts that her agreement includes that she testify truthfully and that her case will be retired. The Defendant similarly contends that Ms. Myers, who represented

Ms. Hale, also lied when she said that Ms. Hale did not receive preferential treatment in exchange for her testimony.

The State contends that this issue is waived because the Defendant failed to raise it in his motion for new trial. In his reply brief, the Defendant concedes as much but asks us to review this issue as it is necessary to do substantial justice because this evidence is material to his case.

As the State correctly notes, the Defendant did not raise this issue in the motion for a new trial. *See* Tenn. R. App. P. 3(e). As explained above, plenary review is therefore waived, and our consideration is limited to one for plain error. *Id.*; *Adkisson*, 899 S.W.2d at 641-42.

At trial, Ms. Hale said that her terms and conditions did not include that the State would dismiss the charges against her if she testified. The Defendant cross-examined her attorney, Ms. Myers, who also testified, and introduced the judgment form that showed that a condition of Ms. Hale's diversion agreement was that she testify and continue to cooperate with the ADA in the Anthony Gray case. We find that Ms. Hale's statement is not wholly inaccurate. While her juridical diversion requires her to testify truthfully, there is no proof that she was given judicial diversion solely based on her testifying. Further, the Defendant cross-examined both witnesses, noted their biases, and submitted to the jury Ms. Hale's judicial diversion agreement. The jury therefore had the information from which it could decide the credibility of the witnesses.

We conclude that justice does not require us to review this issue, as it is not necessary to do substantial justice. The Defendant is not entitled to relief on this issue.

### E. Motion for Judgment of Acquittal and Sufficiency of Evidence

The Defendant contends that the trial court erred when it denied his motion for judgment of acquittal because the State failed to establish the elements of especially aggravated kidnapping, in part because of the "inconsistent and false statements presented." He further contends that the evidence was insufficient to sustain his conviction for kidnapping. We will combine these issues, as our standard of review for each is the same.

Tennessee Rule of Criminal Procedure 29 provides, in pertinent part:

On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

31

Tenn. R. Crim. P. 29(b). When considering a motion for judgment of acquittal, whether at the close of the State's proof or after the conclusion of all proof at trial, the trial court is only concerned with the legal sufficiency of the evidence and not with the weight of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013) (citing *State v. Blanton*, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). "This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010) (citing *Overturf v. State*, 571 S.W.2d 837, 839 & n.2 (Tenn. 1978)). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

Accordingly, we consider whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *Reid*, 91 S.W.3d at 276). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'"

32

*State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *Smith*, 24 S.W.3d at 279). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In the case under submission, the Defendant contends that the trial court erred when it did not grant his motion for a judgment of acquittal on the charge of especially aggravated kidnapping. Especially aggravated kidnapping is false imprisonment, as defined in section 39-13-302, "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . ." T.C.A. § 39-13-305(a)(1) (2018). Tennessee Code Annotated section 39-13-302 defines false imprisonment as occurring when, "A person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."

The evidence in this case, viewed in the light most favorable to the State, proves that Ms. Hale went to the motel room with the Defendant. While there, the two got into an argument, and the Defendant produced a gun. By all accounts, Ms. Hale was crying during this incident, a video of which was entered into evidence. The Defendant mentioned playing Russian roulette, a game during which one can be shot and killed. The victim grabbed the gun and threw it under a sink. She felt unable to leave until Mr. Ingraham arrived, at which time she left and called her mother. We conclude that the trial court did not err when it denied the Defendant's motion for judgment of acquittal. The Defendant highlights inconsistencies in Ms. Hale's testimony, but the jury could have accredited her testimony. Had the jury so done, it would have convicted the Defendant of this offense, but, by it convicting him of the lesser-included offense of kidnapping, it clearly did not accredit the testimony regarding the gun. The judge deciding a judgment of acquittal, however, must determine whether there was sufficient evidence from which any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In this case the trial court did not err when it submitted this charge to the jury.

The Defendant also contends that the evidence is insufficient to sustain his conviction for the lesser-included offense of kidnapping. "Kidnapping is false imprisonment as defined in § 39-13-302, under circumstances exposing the other person to substantial risk of bodily injury." T.C.A. § 39-13-303(a) (2018). As previously stated Tennessee Code Annotated section 39-13-302 defines false imprisonment as occurring when, "[a] person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." The Defendant again takes issue with the inconsistencies in Ms. Hale's testimony and accuses the State of eliciting false testimony. As we previously held, we do not think that Ms. Hale's testimony was patently false, even if inconsistent. Further, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. The jury evaluated Ms. Hale's testimony and found some of it credible. It believed that the Defendant confined Ms. Hale in the motel room, by holding her down physically and making her feel as if she could not leave, and that his confinement exposed her to substantial risk of bodily injury. As we have concluded that the evidence was sufficient to support the trial court's denial of the judgment of acquittal for especially aggravated kidnapping, that same evidence supports the jury's finding of the lesser-included offense. *See State v. Allen*, 69 S.W.3d, 181 188 (Tenn. 2002) (holding that, "[i]n proving the greater offense the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater"). The Defendant is not entitled to relief on this issue.

### F. Motion for New Trial

Finally, the Defendant contends that the trial court erred when it denied his motion for new trial. The Defendant again bases his argument on the testimony presented by Ms. Hale and Officer Knoblock that he states is "false." As we have previously stated, the evidence presented by each witness was not "false," even if inconsistent. Further, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. Accordingly, the trial court did not err when it denied the motion for new trial based on the weight of the evidence.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE